MIGEON et al. v. MONTANA CENT. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1896.)

No. 276.

1. APPEAL—EQUITY DECREES—RULINGS ON EVIDENCE.

A decree in equity will not be reversed for error in admitting or rejecting evidence, where all the circumstances show that the result was not affected thereby. The controlling inquiry is whether there is sufficient competent evidence in the record to sustain the decree.

2. SAME—SPECIFICATIONS OF ERROR—BRIEFS.

When a specification of error as to the rejection of evidence states only the subject of the evidence, and does not give its substance, and the brief contains no reference to the page of the record showing the ruling, as required by rule 24 of the circuit court of appeals for the Ninth circuit (11 C. C. A. xcv., 47 Fed. xi.), the matter is not properly brought to the attention of the court.

3. MINES AND MINING—ABANDONMENT OF LODE CLAIM.

An abandoned lode claim becomes part of the public domain, subject to sale and disposition by the government.

4. SAME—PLACER PATENT—LODE CLAIMS.

A vein lying within the limits of a placer patent is not excluded therefrom as a "known vein or lode," under Rev. St. § 2333, unless at the date of the application the lode or vein was clearly ascertained, and of such extent and value as to justify exploitation. The fact that the lands were at one time previous to the application for the patent supposed to contain a lode or vein of value, or that they were afterwards discovered to be of value, does not impair the title under the patent. 68 Fed. 811, affirmed.

Appeal from the Circuit Court of the United States for the District of Montana.

This was a suit by the Montana Central Railway Company against A. F. Migeon, B. Tibbey, and N. B. Ringeling to determine an adverse claim to certain mining ground. The circuit court rendered a decree for the plaintiff (68 Fed. 811), and the defendants have appealed.

George A. Clark, for appellants.

A. J. Shores, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is a suit in equity, brought by the appellee to determine the adverse claim of appellants to two certain tracts of land, or mining ground, in area 3.67 and 9.60 acres, respectively, situated near Butte, in Silver Bow county, Mont. From the mass of testimony introduced by the respective parties we glean the following facts: On July 2, 1877, Charles Colbert located a quartz lode upon the premises in dispute, under the name of the "Morning Star Lode Mining Claim," containing 1,500 feet in length,—750 feet east and 750 feet west of the point of discovery,—and 300 feet wide on each side of the center of the vein or lode. The discovery point was about 20 feet east of the east boundary of the Noyes placer claims, hereinafter mentioned. Upon the Morning Star a shaft was sunk at the discovery point

in 1877, about 14 feet deep, which disclosed rock of a brown and green stained color, containing mineral, viz. gold, silver, and copper. About 10 tons of ore was taken out from this shaft, and some of it still remains upon the surface. There is some conflict in the testimony as to the value of the ore found in this shaft, but the decided weight and preponderance of the evidence is to the effect that it was not of sufficient value at that time to justify exploitation and the expenditure of time, labor, and money. The ground embraced in the lode location was full of stratas and seams of rock; but, in the opinion of some of the witnesses, it would not be classified as a vein among mining men or prospectors. It was valuable for surface mining, and was profitably worked as placer ground. Another shaft was sunk in 1878, about 75 feet west of the discovery point, about 8 feet deep, which disclosed the same character of material as the discovery shaft. Sufficient work was done upon the claim to hold it for the years 1877 and 1878. In April, 1879, the claim was sold to Valentine Kropf. There is some uncertainty as to the date of the sale. Colbert testified: "I would not exactly be certain when I sold it,—whether it was in April, 1879, or 1880." Kropf said: "If I remember, it was in the summer. I don't remember the year,—'77 or '78. It might have been in '79." Prior to the sale, the claim was jumped by other parties; but Colbert, the original locator, and the subsequent locators, divided their interests equally. Colbert sold his half interest to Kropf for $75. The other half was owned by H. McKinstry. The same year, and shortly after the sale, Kropf and McKinstry quit work on the claim, because there was too much water in the shaft, and have never done any more work thereon, and never bothered themselves with the claim any more. To quote from the testimony of Mr. Kropf:

"Q. After you had worked there several days, you quit? A. Yes, sir. Q. What was the reason for that? A. On account we could not get any further. There was too much water for us. Q. Did you ever do any work on that claim after that? A. No, sir. Q. And you never did any work on the second discovery hole? A. No, sir. * * * Q. What did you do with it afterwards? * * * A. I never bothered any more with it. * * * Q. Did you abandon it, or what? A. I guess we quit it. * * * Q. How long did you and he [McKinstry] remain in partnership after he and you quit work? A. Just when we quit work. We quit, and then I told him I would throw it up. * * * Q. Do you remember of ever having seen any one, after that, doing any work at either of these holes? A. No, sir. Q. Do you remember of ever having seen any location notice after that on this ground? A. No, sir; I never bothered myself about it."

On October 15, 1878, John Noyes and others made a placer location in the vicinity of and including the west 730 feet of the Morning Star lode claim, and thereafter, on December 17, 1878, made application for a patent therefor. On July 25, 1880, a patent was issued for said claims. On January 1, 1882, H. McKinstry located the Childe Harold quartz lode claim at the discovery point of the Morning Star claim, extending 1,450 feet west and 50 feet east of said point, and 300 feet on each side of the center of the vein. Appellants acquired the interest of McKinstry in the Childe Harold location June 20, 1885, and claim to have ever since represented the claim as required by law. On July 25, 1887, appellee acquired

the title to the two tracts of land in controversy in this suit from the grantees of John Noyes, the locator of the placer claims. On September 26, 1887, appellants made application for a patent to the Childe Harold lode. Appellee filed an adverse claim, and on December 10, 1887, commenced this suit in the territorial court, and under the provisions of the act of congress admitting Montana as a state, the suit was removed to the circuit court of the United States. The Noyes placer claims, mineral entry No. 511, and the Childe Harold lode claim embrace within their boundaries both tracts of land. The 9.60-acre tract is within the boundaries of the Noyes placer claim and the Morning Star lode claim.

From the foregoing facts it will readily be seen that the controlling question to be determined herein is whether there was a "known lode" within the limits of the ground in controversy at the time the owners of the Noyes placer claims made application for a patent, on December 17, 1878, within the meaning of section 2333, Rev. St. U. S. In its decree the trial court found the following facts:

"That the plaintiff [appellee] is the owner of, in the possession of, and entitled to the possession of, all and singular the premises set out and described in the complaint herein; * * * that said premises constitute and are a portion of mineral entry No. 511, for which application for patent from the United States was duly made upon December 17, 1878, and for which a United States patent was duly issued to the applicants therefor on July 28, 1880; that at the time said application for patent there was no lode of quartz containing gold, silver, copper, or other metals known to exist within the exterior boundaries of said mineral entry No. 511; that all and singular the averments of plaintiff's [appellee's] complaint and replication herein are true, and that the averments of the answer of the defendants herein inconsistent therewith are not true; and that plaintiff is entitled to a decree as prayed for in its complaint herein."

Upon these findings the court granted the relief prayed for in the complaint.

There are 31 distinct specifications of error presented by appellants. It is evident, by a brief reference thereto, that many of them cannot be reviewed by this court, and that it is unnecessary to specifically review others. There is a footnote in the transcript, which states that certain depositions were not read at the trial, and that there was an understanding between counsel and the court that exceptions would be allowed to the rulings that might be made upon the objections noticed in the deposition; but there is nothing in the record showing that any rulings were made upon any of these objections.

The specifications of error from No. 1 to 10, inclusive, are based upon imaginary rulings of the court upon the objections noted in the depositions; the assignments being that the court erred "in rejecting, if it did reject it," etc. Appellate courts are too busily engaged in answering questions which relate to material matters that are properly presented to waste any time in attempting to review irrelevant specifications of imaginary errors.

The specifications from No. 11 to 20, inclusive, refer to alleged errors committed by the court in admitting or excluding testimony at the trial against the objection of appellants. In the con-

sideration of such specifications of error the general rule is that, in equity suits tried before the judge without a jury, the appellate court ought not to reverse the case merely upon the ground that the judge received irrelevant testimony, or that he rejected testimony that was admissible, where, upon all the facts and circumstances of the case, it is clearly apparent that the result would not have been different if the testimony objected to had been rejected in the one case or received in the other. Bank v. Greenhood (Mont.) 41 Pac. 251, 267, and authorities there cited; Scroggin v. Johnston, 45 Neb. 714, 64 N. W. 236, 238, and authorities there cited; Holmes v. State (Ala.) 18 South. 529. The controlling inquiry in such cases is whether there is sufficient competent evidence in the record to sustain the decree. Grayson v. Lynch, 163 U. S. 468, 476, 16 Sup. Ct. 1064, 1067. In Mammoth Min. Co. v. Salt Lake Foundry & Mach. Co., 151 U. S. 447, 451, 14 Sup. Ct. 384, 386, the court, in considering assignments of error in the admission of evidence, after quoting the language of the territorial court that: "These errors are not available in a case in equity, for the chancellor is supposed only to act on proper evidence. There is no question of law involved; only questions of fact; and, if the proper evidence justifies the decree, the judgment ought to be affirmed, and we think it does,"—said:

"In its assignment of errors here appellant specifies substantially the same exceptions to the admission of evidence, including the overruling of defendants' objections to questions. The evidence thus objected to was cumulative in its character, and not of controlling importance; and, if excluded, it is sufficiently clear that the result would not have been otherwise than it was. All the evidence is in the record, and we have carefully examined it; and, as we are of opinion that the rulings complained of, if erroneous, did not constitute reversible error, we need not pass upon their correctness, though we are not to be understood as intimating that the objections should in any instance have been sustained."

It is proper to add that some of the assignments of error do not meet the requirements of rule 24 of this court. 11 C. C. A. xcv., 47 Fed. xi. Specification No. 11 will be taken for illustration. It specifies that the court erred "in rejecting the evidence of the engineer, John Gillie. a witness for the appellants at the trial. Exception taken and allowed by the appellants as to the results of an examination made by him of several excavations or shafts upon the Childe Harold claim, and assays of ore taken therefrom, said shafts being on a direct line between shafts A and C, the original points of discovery of the Morning Star vein." Rule 24 of this court provides that: "When the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected," and that the briefs of counsel must contain "a reference to the pages of the record and the authorities relied upon in support of each point." A strict compliance with these provisions would not only be of great advantage to counsel in their arguments, but would materially aid the court, and lessen its labors. It is the duty of an appellant to particularly point out the alleged error upon which he relies, and to directly refer the court to the page of the transcript where the alleged erroneous ruling of the court is to be found. Mr. Gillie's

testimony covers 25 pages of the printed record, no portion of which is quoted in the specifications. Only two of the pages are referred to in appellants' brief, and on the first one (281) the question to which objection was made was withdrawn, and no ruling of the court was made thereon. On the other page (304) it appears that appellants asked generally that an exception be entered to the ruling of the court in excluding certain specified testimony, which does not affirmatively appear to relate to the error specified. Upon reading the entire testimony of Mr. Gillie, we fail to find any ruling of the court to which the assignment of error applies. But in the present case no technical grounds will be relied upon in the disposition of any of the errors assigned. They all relate to the exclusion of testimony as to assays taken from the Childe Harold lode long subsequent to the issuance of the placer patent, to the existence of certain other locations west of the Morning Star lode in 1878, and to the admission of testimony as to the value of mineral ore found on the Morning Star lode location, and as to the percentage of mineral in the ore necessary to pay expenses at that time, etc. The determination of the principles which should govern courts in deciding the main question as to what constitutes a "known lode" under the provisions of the statute will necessarily dispose of all of these assignments of error upon their merits.

The remaining specifications, from 21 to 30, inclusive, are principally directed against the views expressed by the court in its opinion upon the merits of the case. They can all properly be grouped together, and require no separate review.

We shall not stop to inquire whether any of the reasons expressed by the court were irrelevant or erroneous. The point to be decided is whether the conclusions arrived at are sustained by the evidence and the law. Sullivan v. Mining Co., 143 U. S. 431, 12 Sup. Ct. 555.

Is the decree of the court correct? Before proceeding to discuss the controlling question, it is proper to state that appellants are not claiming any title under the Morning Star lode location. Their application for a patent was made for the Childe Harold lode claim, which was located after the issuance of the patent for the placer claims. Appellants, however, argue that the placer patent as to the west 730 feet of the Morning Star claim is void, for the reason that at the time of the application for the placer patent the west 730 feet of the Morning Star was property which was withdrawn from sale by the United States; that any patent purporting to convey any portion of the ground was an absolute nullity; that the Noyes placer application did not include the Morning Star lode; that neither said application nor the patent could include the said 730 feet of the Morning Star lode; that the title thereto remained in the government, in trust for the claimants' under the existing location of the lode claim and their assigns, to be perfected upon the performance by them of the acts required by law. This argument is based upon the assumption that by a mere location of a quartz lode the ground is withdrawn from sale, independent of the question whether a lode is discovered or known to exist. If

the Morning Star was a valid and subsisting location at the time of the issuance of the patent to the Noyes placer claims, an important and interesting question would be presented as to whether, in a case like the present, the patent could be collaterally assailed. The law is well settled that a mining claim that has in all respects been fully perfected under the requirements of law is property in the fullest sense of that term, and therefore, during the time of its valid existence as such, would not be subject to the disposal of the government to other parties. Belk v. Meagher, 104 U. S. 279, 283; Noyes v. Mantle, 127 U. S. 348, 353, 8 Sup. Ct. 1132, 1134. But the fact is, as appears from the testimony in the record, that the Morning Star lode claim had been abandoned prior to the time of the issuance of the patent to the Noyes placer claims. This being true, it follows that the land embraced in the placer patent was, at the time of the issuance of the patent, a part of the public domain, which the government had the power to sell and dispose of. This brings us to a consideration of the controlling question in the case.

Section 2333 of the Revised Statutes reads as follows:

"Where the same person, association, or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of this chapter, including such vein or lode, upon the payment of five dollars per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim or any placer claim not embracing any vein or lode claim, shall be paid for at the rate of two dollars and fifty cents per acre, together with all costs of proceedings; and where a vein or lode, such as is described in section 2320, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof."

In the application for the patent of the Noyes placer claim no statement was made that it included any vein or lode within the boundaries of the placer ground. The question, therefore, is whether a vein or lode was at that time known to exist within such boundaries. What must be proven in order to establish the fact that a vein or lode was "known to exist," within the meaning of those words as used in the statute? When can it be said that a vein or lode is known to exist? Was there a known lode or vein within the boundaries of the Noyes placer claims at the time of the application for a placer patent? There are four classes of cases where the courts have been called upon to determine what constitutes a lode or vein within the intent and meaning of different sections of the Revised Statutes: (1) Between miners who have located claims on the same lode, under the provisions of section 2320; (2) between placer and lode claimants, under the provisions of section 2333; (3) between mineral claimants and parties holding town-site patents to the same ground; (4) between mineral and agricultural claimants of the same land. The mining laws of the United States were drafted for the purpose of protecting

the bona fide locators of mining ground, and at the same time to make necessary provision as to the rights of agriculturists and claimants of town-site lands. The object of each section, and of the whole policy of the entire statute, should not be overlooked. The particular character of each case necessarily determines the rights of the respective parties, and must be kept constantly in view, in order to enable the court to arrive at a correct conclusion. What is said in one character of cases may or may not be applicable in the other. Whatever variance, if any, may be found in the views expressed in the different decisions touching these questions arises from the difference in the facts and a difference in the character of the cases, and the advanced knowledge which experience in the trial of the different kinds of cases brings to the court. Mr. Justice Field, in a dissenting opinion in Iron Silver Co. v. Mike & Starr Gold & Silver Min. Co., 143 U. S. 394, 423, 12 Sup. Ct. 543, 552, after announcing certain principles, said:

"If there be any variance between these views and those expressed in Mining Co. v. Reynolds, 124 U. S. 374, 384, 8 Sup. Ct. 598. as to the manner in which knowledge of the existence of a lode within the boundaries of a placer claim may be obtained, it is because of a more careful consideration of the subject in later years than formerly, and of larger experience in mining cases."

The fact is that there is a substantial difference in the object and policy of the law between the cases where the determination of the question as to what constitutes the discovery of a vein or lode between different claimants of the same lode under section 2320, on the one hand, and a "lode known to exist" within the limits of a placer claim at the time application is made for a patent therefor under section 2333, in the other. As was said in U. S. v. Iron Silver Min. Co., 128 U. S. 673, 680, 9 Sup. Ct. 195, 198:

"The amount of land which may be taken up as a placer claim and the amount as a lode claim, and the price per acre to be paid to the government in the two cases, are different. And the rights conferred by the respective patents, and the conditions upon which they are held, are also different. Rev. St. §§ 2320, 2322, 2325, 2333; Smelting Co. v. Kemp, 104 U. S. 636, 651; Mining Co. v. Reynolds, 124 U. S. 374, 8 Sup. Ct. 598."

The question as to what constitutes a discovery of a vein or lode under the provisions of section 2320 of the Revised Statutes has been decided by many courts. All the authorities cited by appellants are referred to in Book v. Mining Co., 58 Fed. 106, 121. The liberal rules therein announced are substantially to the effect that when a locator of a mining claim finds rock in place containing mineral in sufficient quantity to justify him in expending his time and money in prospecting and developing the claim, he has made a discovery within the meaning of the statute whether the rock or earth is rich or poor, whether it assays high or low, with this qualification: that the definition of a lode must always have special reference to the formation and peculiar characteristics of the particular district in which the lode or vein is found. It was never intended that in such a case the courts should weigh scales to determine the value of the mineral found as between a prior and subsequent locator of a mining claim on the same lode.

But in construing the provisions of section 2333 it is evident that

other questions are to be taken into consideration. This section of the statute was primarily intended for the benefit and protection of the locators of placer claims. If a lode is known to exist within the boundaries of a placer claim, the applicant for a patent must state that fact, and then, by paying $5 an acre for that portion of the ground, and $2.50 an acre for the balance, a patent will issue to him, covering both the lode and placer ground; but, if the lode is known to exist, and is not included in the application for a patent, then it will be construed as a conclusive declaration that the owner of the placer claim has no right of possession, by virtue of his patent for the placer ground, to the vein or lode. It matters not whether there is a lode or vein actually within the limits, which subsequent developments may prove, if it is not known to exist at the time of the application the patent for the placer claims will include such lode or vein. In such cases the supreme court has repeatedly declared that it is not enough that there may have been some indications, by outcropping on the surface, of the existence of lodes or veins of rock in place bearing gold or silver or other precious metals to justify their designation as "known veins or lodes"; that, in order to meet that designation, the lodes or veins must be clearly ascertained, and be of such extent as to render the land more valuable on that account, and justify their exploitation. Mining Co. v. Reynolds, 124 U. S. 374, 383, 8 Sup. Ct. 598, 603; U. S. v. Iron Silver Min. Co., 128 U. S. 674, 683, 9 Sup. Ct. 195, 199; Iron Silver Min. Co. v. Mike & Starr Gold & Silver Min. Co., 143 U. S. 394, 404, 424, 12 Sup. Ct. 543, 553; Sullivan v. Mining Co., 143 U. S. 431, 12 Sup. Ct. 555; Brownfield v. Bier (Mont.) 39 Pac. 461, and authorities there cited. This construction as to the meaning of section 2333 is, in our opinion, founded in reason, and is in harmony with the construction given by the courts to the other sections of the statute relative to the rights of locators of mining claims upon the public lands of the United States. But, in any event, the rule, as above stated, is now too well settled to be departed from.

The decisions of the supreme court upon controversies arising between mineral claimants on one side and parties holding town-site patents on the other are applicable to this class of cases. The doctrines therein announced are directly in line with the cases we have referred to. In such character of cases the court has repeatedly declared that, under the acts of congress which govern such cases, in order to except mines or mineral lands from the operation of a town-site patent, it is not sufficient that the lands do in fact contain minerals, or even valuable minerals, when the town-site patent takes effect; but they must at that time be "known" to contain mineral of such extent and value as to justify expenditures for the purpose of extracting them; and, if the lands are not known at that time to be so valuable for mining purposes, the fact that they have once been valuable, or are afterwards discovered to be still valuable, for such purposes, does not defeat or impair the title of persons claiming under the town-site patent. Deffebach v. Hawke, 115 U. S. 393, 404, 6 Sup. Ct. 95, 101; Davis'

Adm'r v. Weibbold, 139 U. S. 507, 525, 11 Sup. Ct. 628, 635; Dower v. Richards, 151 U. S. 658, 663, 14 Sup. Ct. 452, 454.

It is argued by appellants that Noyes v. Mantle, supra, "is identical as to facts and dates with the case at bar," and that upon the authority of that case the judgment in this should be reversed. The owners of the Morning Star location did not file any protest to the application for the placer patent. The plain inference and presumption is that at that time they believed the Morning Star was valueless as a lode claim. The presumptions, if any are to be indulged in, are all in favor of the validity of the patent. This case differs from Noyes v. Mantle in the fact that the evidence clearly shows that the Morning Star was abandoned before the placer patent was issued. The owners quit work thereon, and, after they left it, they never bothered themselves about it. While it is true that the provisions of section 2333 were intended to apply only to lodes or veins which had not been located, and the laws in respect thereto had been fully complied with, so as to become the property of the locators (Sullivan v. Mining Co., 143 U. S. 431, 12 Sup. Ct. 555, and authorities there cited), yet this principle should not be, and never has been, extended to a mere location of an alleged vein or lode of the character as shown by the evidence in this case, so as to withdraw the ground covered by the location from the operation of the provisions of the statute where the location has been abandoned before the placer patent is issued. The discovery shaft and the other shafts sunk upon the Morning Star were not within the limits of the patented placer claims. There had not been any developments made showing that the mineral-stained rock therein found extended into the patented placer ground, or that the ore found in the shafts was sufficient to justify the expenditure of time, labor, and money in developing the same. In Iron Silver Min. Co. v. Mike & Starr Gold & Silver Min. Co., supra, the court said:

"It is undoubtedly true that not every crevice in the rocks, nor every outcropping on the surface, which suggests the possibility of mineral, or which may, on subsequent exploration, be found to develop ore of great value, can be adjudged a known vein or lode within the meaning of the statute."

And in the further discussion of that case the court said:

"The amount of the ore, the facility for reaching and working it, as well as the product per ton, are all to be considered in determining whether the vein is one which justified exploitation and working."

Within this principle it is manifest that the trial court did not err in admitting testimony as to the value of the ore disclosed in the shafts on the Morning Star. The evidence to the effect that, long after the issuance of the placer patent, developments were made on the Childe Harold lode of such a character as tended to prove the existence of a lode extending into the placer ground was wholly immaterial and irrelevant.

In Sullivan v. Mining Co., supra, the court said:

"A placer patent conveys to the patentee full title to all lodes or veins within the territorial limits not then known to exist. So it matters not what developments or discoveries were made by these defendants after the issue of the pat-

77 F.—17

ent. Nothing then disclosed could limit the effect of the patent, or except from its scope any vein or lode within its territorial limits."

The same principle is announced in several of the other authorities herein referred to.

From whatever standpoint this case can be viewed, under the evidence presented at the trial, we are of opinion that the fact as found by the court that there was no lode or vein known to exist within the boundaries of the placer claims at the time of the application for the placer patent is fully sustained, and justifies the conclusions reached by the court.

The judgment and decree of the circuit court is affirmed, with costs.